UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| NANCY RUSSELL, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 3:14-CV-01592 JD |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) |
| Defendant. | ) |

## **OPINION AND ORDER**

Plaintiff Nancy Russell applied for but was denied social security disability insurance benefits by the Social Security Administration. Russel is appealing the denial and the matter has been briefed [DE 15, 21], although no reply was filed. For the following reasons, the Court REMANDS this matter to the Commissioner for further proceedings.

### I.     FACTUAL BACKGROUND

Russell filed her initial application for benefits on March 23, 2011, alleging an onset date of July 1, 2002[1] due to degenerative disc disease, arthritis, and back pain. Russell indicated she stopped working on account of her physical condition, as well as having to take care of ill family members (Tr. 160). While she once noted having been on antidepressants since 1983 (Tr. 186, 195), she clarified that in fact she had not been taking any medications for depression, anxiety, or psychiatric conditions since December 2009 (Tr. 176). In an updated disability report from September 2011, Russell claimed that she was experiencing more fatigue and sadness, and the onset of memory loss (Tr. 182). As of October 2011, Russell indicated that she did less and less

---

[1] Although Russell's attorney acknowledged an amended onset date of July 29, 2003, he had no problem with the ALJ's considering the entire time frame, from the original onset date to Russell's date last-insured, December 31, 2007 (Tr. 19-26, 35).

because of pain/weakness, feeling sick, and having a lack of energy/desire, resulting in good days and bad days (Tr. 188-194). She reported having a more recent onset of neck issues (Tr. 200), and having been recently diagnosed with an autoimmune disorder called mixed connective tissue disease, which helped explain the decline in her mental and physical state in the last several years (Tr. 195).

In summary,[2] Russell's medical records reflect that a lumbar x-ray taken on June 12, 2000, showed moderate degenerative osteophytes (bone spurs) and moderate narrowing of the L5-S1 disc space (Tr. 408). In October 2001, Dr. David Miller, a pain specialist, observed that Russell had marked tenderness over her sacroiliac (SI) joints and diagnosed her with sacroiliitis (Tr. 249, 297). Dr. Miller administered steroid injections in her SI joints (Tr. 249). Russell continued treatment with Dr. Miller well into 2009 (Tr. 300, 306), with Dr. Miller documenting his course of treatment and exam findings with respect to Russel's back pain, neck pain, right knee pain, and problems with sleeping and snoring (Tr. 214-283, 288-308). Dr. Miller also documented Russell's complaints of these conditions and their resulting restrictions. *Id*.

Russel's medical records reveal that she also sought treatment primarily in 2004 and late 2008 through 2012 from Dr. Minesh Patel, who specialized in internal medicine (Tr. 248, 253-262, 276, 309, 319-338, 463-69, 477-91, 496-502). The medical records from Dr. Patel in 2004 documented Russell's complaints of, and Dr. Patel's treatment for, her mid-back pain, shortness of breath, fatigue, sleeping difficulty, hypothyroidism, gastroesophageal reflux disease, hyperlipidemia, obesity, and attention deficit disorder (ADD). As of late 2008 (after Russell's date last-insured), Dr. Patel continued treating Russell for her documented back and foot pain,

---

[2] Russel's relevant medical records are detailed with further specificity in the legal analysis section. *See, infra*.

arthralgia, asthma, liver cysts, obesity, high blood pressure, and high cholesterol. Dr. Patel also noted that Russell was having problems with depression and anxiety.

Even after Russell's date last-insured, Russel began a course of treatment with Drs. Biehl and Puranik, which involved a continuation of her pain medication and steroid injections for pain in her right knee, lower back, and neck (Tr. 309-310, 312-316, 346-351, 353, 356, 359-366, 370-391, 446-455).

With respect to her mental conditions, Russell's medical records reveal that in April 2004, she went to Lifepaths for an initial psychological evaluation (Tr. 505-09). She complained of depressive symptoms, anxiety, decreased concentration and energy, forgetfulness, and mood swings (Tr. 503-514). Russell was not taking any medications for mental impairments because she did not feel like anything had helped (Tr. 508), and she had never before seen a psychiatrist (Tr. 510). She was diagnosed with depression, anxiety, sleep disturbance, and alcohol abuse, and she was prescribed Effexor (Tr. 513). Russell sporadically continued treatment at Lifepaths, with records noting her having additional problems with forgetfulness and being easily distracted, until February 2005 when it was reported that she was feeling better (Tr. 504).

At the administrative hearing with Administrative Law Judge Lawrence Levey (ALJ) on November 14, 2012, Russell was represented by counsel and she testified, along with vocational expert Pat Greene, Ph.D. (VE) (Tr. 31-59). Russell testified that throughout the entire claims period she had been taking anti-depressive medication (mostly prescribed by her family physician), Vicodin (or Hydrocodone), Meloxicam, as well as, an anti-anxiety medication on and off. She had previously worked for 25 years as a certified surgical technician, and indicated that she did not return to work because of the pain in her back, neck, and right knee, which caused her to suffer from standing, walking, and sitting limitations—despite taking pain and arthritis

3

medication and undergoing spinal injections (but declining surgical intervention due to the risks). Russell testified that her neck pain and stiffness caused her problems with neck movement, dizziness, and an inability to look in one direction for a long time. Russell believed that the arthritis in her hands prohibited her from using her hands on more than an occasional basis, or one-third of the day. Russell further explained that she's had an ongoing problem with fatigue, the cause of which was unknown for some time. Russell testified that she sought treatment with a psychiatrist in 2004 and 2005 for her depression, which caused frequent sadness, crying spells, suicidal thoughts, mood swings, anger issues, problems socializing, and difficulty with memory, focus, and concentration. In describing a typical day around June 2007, Russell indicated that she woke up early and made coffee, packed her husband's lunch, did laundry, washed dishes, and took care of her mom (with the assistance of caregivers). However, she had to take breaks from performing these tasks due to her pain.

In the written opinion that followed (Tr. 19-26), the ALJ found that Russell suffered from the following severe impairments: degenerative disc disease, hypercholesterolemia, obesity, occipital neuralgia, osteoporosis, and sleeping disorder. The ALJ believed that Russell's impairments were severe but did not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). In fact, Russell's attorney acknowledged that no Listing was met or equaled (Tr. 36).

The ALJ determined that Russell was less than fully credible regarding the severity of impairments, given (1) her essentially normal physical examinations after the onset date; and, (2) her self-reports (preceding her date last-insured) of being no more than mildly-to-moderately impaired with no problems walking or standing, able to engage in a full range of daily activities, and able to heavily care for ill family members. The ALJ indicated that "[d]espite the limited

physical findings and the claimant's own reported level of functioning," the ALJ included (unspecified) limitations associated with Russell's cervical degenerative disc disease and complaints of severe neck and right knee pain; provided postural and environmental limitations as assessed by the state agency and as associated with her obesity; and limited her to simple, routine, and repetitive tasks due to fatigue and the effects of prescribed medication.

Specifically, the ALJ found that Russell had the residual functional capacity (RFC)[3] to perform "light" work, as defined in 20 C.F.R. § 404.1567(b) (i.e., lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; sitting up to at least 6 hours in an 8 hour workday; and, standing/walking, in combination, up to at least 6 hours in an 8 hour workday), along with the following limitations:

> Option of alternating between sitting and standing, could only occasionally utilize her right lower extremity for pushing, pulling, and operation of foot controls, could only occasionally climb ramps or stairs, balance, and stoop, was precluded from climbing ladders, ropes, or scaffolds, and from kneeling, crouching, and crawling, could engage in only occasional rotation, flexion, and extension of her neck, was required to avoid concentrated exposure to excessive wetness, unprotected heights, and hazardous machinery, and due to her impairments, symptoms, and medications, was limited to performing simple, routine, and repetitive tasks.

(Tr. 23).

The ALJ presented a hypothetical question to the VE which was based on the ALJ's RFC determination (listed above). Consistent with the VE's testimony, the ALJ concluded that Russell was unable to perform any past relevant work as a surgical technician (which is a job Russell performed full time since 1982 until July 2002). However, the ALJ concluded that Russell could perform the jobs identified by the VE (which again, were based on the RFC listed above), including unskilled work as a ticket seller, hand packager, and assembler of small

---
[3] Residual Functioning Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545.

5

products.[4] As a result, the ALJ determined that Russell was not disabled. The Appeals Council denied review of the ALJ's decision, making the decision the final determination of the Commissioner. 20 C.F.R. § 404.981; *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013).

## II. STANDARD OF REVIEW

In reviewing the decision, the Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citation omitted). Rather, an ALJ must "articulate at some minimal level his analysis of the evidence" to permit an informed review. *Id.* Consequently, an ALJ's

---

[4] The VE also testified that if Russell's RFC were limited to sedentary work or she was off task more than ten percent due to pain or focus/concentration problems, then she would be unable to sustain employment (Tr. 57).

6

decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### III.    ANALYSIS

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged

by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

In contesting the Commissioner's denial of benefits, Russell argues that the Commissioner erred in four respects: (1) the ALJ misevaluated the medical opinions of record and gave insufficient reasons for disregarding evidence from Russell's treating physicians, Drs. Miller and Patel; (2) the ALJ failed to consider Russell's mental impairment in combination with her other limitations; (3) the ALJ's credibility assessment was unsupported by substantial evidence; and (4) ultimately these errors affected the RFC determination, and as a result, the Commissioner failed to carry the burden at step five establishing that Russell was capable of performing jobs that existed in sufficient numbers. The Court agrees with Russell that the ALJ disregarded significant treatment received by Russell from Drs. Miller and Patel, and that the ALJ's failure to adequately consider and weigh this medical evidence results in an inadequately supported RFC determination, thereby requiring remand.

**A) Weight Afforded Treating Physicians and Russell's RFC**

An RFC assessment is to be based upon consideration of all relevant evidence in the case record, including medical evidence. SSR 96-5p. With respect to medical evidence, the ALJ must give controlling weight to a treating physician's opinion if it is well supported by medically acceptable diagnostic techniques and it is not inconsistent with other substantial evidence of

record. 20 C.F.R. § 404.1527(c); *Elder*, 529 F.3d at 415. When the treating physician's opinion is not entitled to controlling weight, however—such as where it is not supported by the objective medical evidence, where it is inconsistent with other substantial evidence in the record, or where it is internally inconsistent, *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995))—then the ALJ should move on to assessing the value of the opinion in the same way he would any other medical evidence. *See* 20 C.F.R. § 404.1527(c)(2).

Assessing what weight to afford the opinion depends on a number of factors, such as the examining relationship (with more weight given to an opinion of an examining source); the treatment relationship, which includes the length, frequency, and nature of the treatment; the degree to which the source presents relevant evidence to support the opinion; the consistency of the source's opinion with the other evidence; whether the source specializes in an area related to the individual's impairment; and any other factors tending to support or refute the opinion. 20 C.F.R. § 404.1527(c); *Elder*, 529 F.3d at 415. If the ALJ discounts the treating physician's opinion after considering these factors, his decision must stand as long as he "minimally articulated his reasons—a very deferential standard that we have, in fact, deemed lax." *Elder*, 529 F.3d at 415 (citing *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)).

In explaining the RFC finding, the ALJ summarized almost seven years-worth of medical records (pre-dating December 31, 2007) from treating physicians Drs. Miller and Patel by simply stating that Russell had "several normal or essentially normal physical examinations." (Tr. 24 (citing Exhibit 1F)[5]). The Commissioner unbelievably contends that this single statement reveals

---

[5] The only other references made by the ALJ to Drs. Miller and Patel's medical records pre-dating Russell's last-insured date, which were located in Exhibits 1F and 3F, referred to Russell's having a normal social life (Tr. 11) and Russell's own reported level of functioning (Tr. 28).

9

that the ALJ cited to substantial evidence in considering Russell's treatment history and weighing the medical opinions (DE 21 at 4-5).

The Commissioner's argument is flawed[6] because although it is true that the ALJ cited to an exhibit which actually contained records from both Drs. Miller and Patel, the ALJ never bothered to specifically identify the examinations which supported the ALJ's opinion. In other words, the exhibit referred to by the ALJ as containing "essentially normal" exams is over sixty pages long and there is no way to discern the specific records relied upon by the ALJ. In fact, the ALJ never once referenced Drs. Miller or Patel by name, nor noted that these were records from treating physicians.

Even had the ALJ identified the "essentially normal" exams upon which he relied to determine Russel's RFC, the ALJ failed to mention whether or not he considered the plethora of other medical records from Drs. Miller and Patel evidencing Russell's ongoing ailments and limitations. For instance, in September 2002, Russell saw Dr. Miller for persistent right SI joint pain, for which she had been taking Vioxx (an anti-inflammatory) and an occasional Vicodin (narcotic pain medication), at which time Dr. Miller renewed Russell's prescriptions (Tr. 296); in March 2004, Russell saw Dr. Patel with complaints of mid-back pain and shortness of breath (Tr. 248, 260-62) and Dr. Patel concluded that Russell suffered from exertional dyspnea of an undetermined etiology, fatigue and tiredness (which could be related to a sleep disorder or underlying hypothyroidism), and gastroesophageal reflux disease; the following month, Dr. Patel assessed Russell with ADD, for which he tapered off Russell's Prozac and prescribed a trial of Strattera (commonly prescribed for ADD) (Tr. 258-60); in November 2006, Dr. Miller saw Russell for congestion and problems with sleeping/snoring, and he diagnosed her with 'sleep

---

[6] Nor does Russell need to actually prove disability to warrant a remand, as the Commissioner argues in error (DE 21 at 5).

disorder breathing' (Tr. 221, 223-224, 226, 250); on December 21, 2006, Russell's cervical spine x-ray taken on account of her neck pain and obstructed breathing revealed advanced degenerative changes in the cervical spine and diffused osteoporosis (Tr. 244); on December 28, 2006, Russell saw Dr. Miller for neck pain, for which she had been taking her husband's Vicodin, and Dr. Miller indicated that Russell had advanced multi-degenerative disc disease and facet changes, a restricted range of motion in unspecified joints, and prominent myofascial tender points in the left trapezius and scapulae (shoulder blades), for which Dr. Miller prescribed Vicodin, Daypro (anti-inflammatory), and Baclofen (muscle relaxant) (Tr. 295); cervical x-rays taken in December 2006 showed diffuse osteoporosis and advanced degenerative changes with slight narrowing at two levels of Russell's cervical spine due to osteophyte (bone spur) formation (Tr. 244); and, in December 2007, Russell complained of persistent, intermittent, severe left occipital neck pain and had marked tenderness in that area to the touch (even though she was taking Effexor, Mobic, and Vicodin), which led Dr. Miller to diagnose Russell with occipital neuralgia and administer a nerve block with sedation (Tr. 292-94). Finally, in September 2012, Dr. Patel completed a medical source statement form in which he reported that Russell could only lift fewer than ten pounds frequently and occasionally; stand/walk for less than two hours total in an eight-hour day; sit for less than six hours total with frequent position changes needed to get comfortable; never perform most postural movements other than occasional balancing; occasionally reach, handle, and finger with her upper extremities; and had a limited ability to push/pull with her upper and lower extremities (Tr. 498-502, Exhibit 20F).

Thus, a quick look at these medical records demonstrate that the ALJ's single statement that Russell's treating records contained "essentially normal" exams certainly did not satisfy the ALJ's duty to develop the record and make findings about what the actual evidence showed, 20

C.F.R. § 404.1512(d), 1520b, nor did it adequately articulate the ALJ's analysis so the undersigned could follow his reasoning. *See Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015) ("The ALJ has a duty to fully develop the record before drawing any conclusions and must adequately articulate [his] analysis so that we can follow [his] reasoning."). While it is true that an ALJ is not required to mention, or make note of every piece of evidence in his decision and in weighing the record medical evidence, *see Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009), it is equally true that an ALJ may not ignore an entire line of evidence that is contrary to the ruling, *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted), and he must minimally articulate his reasons so that the Court is able to trace his path of reasoning. *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (The ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning . . . [and] [a]n ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required.") (citations omitted). The ALJ contravened his duties in this respect by making a single overboard statement which failed to accurately characterized Russell's treatment history and failed to sufficiently support the RFC's assessment.

Moreover, the ALJ never assessed the weight to be afforded to the exhibits which contained Drs. Miller and Patel's various opinions/diagnoses during the relevant time frame. In determining the weight to be given, the ALJ should have discussed the nature of Russell's treatment relationship with Drs. Miller and Patel (including the length, frequency, and nature of such ongoing treatment), their specialties in the area relating to Russell's impairments, and the degree to which the treating physicians presented evidence (including here, objective testing) consistent with their opinions. For instance, with respect to Dr. Patel's April 2014 treatment note indicating that a screening test revealed Russel had ADD and his September 2012 opinion

evidencing that Russell was far more restricted than the ALJ's ultimate RFC determination, the ALJ never referred to these records and never discredited Dr. Patel's opinions.[7] The ALJ's failure in this respect violates the ALJ's need to weigh the medical evidence and consider the factors listed in 20 C.F.R. § 404.1527(c) in the event the opinions were discounted.

Ultimately, it is impossible for this reviewing court to tell whether the ALJ's decision rests upon substantial evidence, and a remand is required here because the ALJ improperly ignored the medical records of treating physicians Drs. Miller and Patel which supported Russell's disability claim. *See Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014) (an ALJ's "apparent selection of only facts from the record that supported [his] conclusion, while disregarding facts that undermined it, is an error in analysis that requires reversal."). In addition, the ALJ's insufficient analysis of Drs. Miller and Patel's records and the weight afforded to their opinions affected the ALJ's RFC findings about the extent of Russell's limitations (Tr. 24). Until the ALJ supplies sufficient analysis of the records and reason to discount Russell's treating physicians' opinions, the Court is unable to conclude that the RFC is supported by substantial evidence. *See* SSR 96-5p; 20 C.F.R. § 404.1545(a) (noting the ALJ must "assess [the claimant's] residual functional capacity based on all the relevant evidence in [her] case record").

As a result, on remand the ALJ must acknowledge the treating physicians' course of treatment and opinions, weigh the medical opinions, and explain whether the evidence would support further physical and mental limitations in the RFC. The ALJ should then explain how Russell's limitations were accounted for in the RFC assessment.

---

[7] Nor did the ALJ clarify whether Russell's restrictions recorded by Dr. Patel in September 2012 were meant to signal that these were her restrictions at the time of the notation or during the insured period.

**B)     Russell's Ability to Perform Work**

The ALJ found that Russell could not perform her past work (step four), but she was able to perform other jobs that existed in significant numbers in the national economy (step five). In deciding what work Russell was capable of performing, the ALJ relied on the VE's testimony, which in turn relied on the ALJ's hypothetical question—which was ultimately premised on the ALJ's RFC determination.

The ALJ is required to incorporate into his hypotheticals those impairments and limitations that he accepts as credible. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Here, the ALJ's insufficiently supported RFC findings about the extent of Russell's limitations led the ALJ to ask hypotheticals of the VE based on some, as opposed to all, of Russell's complaints. Once the ALJ provides an adequate analysis of the medical evidence and support for his RFC finding, which can then be used as the basis for the hypotheticals, the Court can assess whether a VE's testimony can be relied upon as an accurate indicator for the type of work Russell is capable of performing.[8] But because it is the ALJ's duty to assess the record evidence, explain the weight to be afforded to it, and determine the claimant's actual limitations and resulting RFC, 20 C.F.R. §§ 404.1520(e), 404.1545, 404.1546(c), steps four and five cannot be properly analyzed in this appeal. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ

---

[8] Admittedly, the Seventh Circuit has occasionally concluded that a VE has familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations and the VE considered that evidence when indicating the type of work the claimant is capable of performing. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the VE reviewed only Russell's vocational records, but not medical records, and the VE did not indicate in his responses to having relied on the medical records or the hearing testimony. Rather, the VE's attention was on the limitations of the hypothetical person posed by the ALJ, rather than on the record itself or the limitations of the claimant herself. *Id*. (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).

must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); SSR 96-8p.

Because remand is appropriate for the reasons stated herein, the Court need not reach a decision on whether the ALJ's credibility assessment was also in error. The remedy for these shortcomings is further consideration, not an award of benefits.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Russell's request to remand the ALJ's decision [DE 1]. Accordingly, the Court now REMANDS this case to the Commissioner for further proceedings consistent with this Opinion and Order.

SO ORDERED.

ENTERED: September 21, 2015

    /s/ Jon E. DeGuilio
Judge
United States District Court